## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

JAMES F. HAUPT,

              *Plaintiff,*

*v.*

 JANET L. YELLEN, United States
Secretary of the Treasury,[1]

            *Defendant.*
_____/

Case No. 1:21-cv-10390

District Judge Thomas L. Ludington
Magistrate Judge Patricia T. Morris

## REPORT AND RECOMMENDATION

### I.   RECOMMENDATION

For the following reasons, I **RECOMMEND** that the Court **GRANT** Defendant Janet L. Yellen's motion for summary judgment.  (ECF No. 17).

### II.   REPORT

Plaintiff James F. Haupt, proceeding *pro se,* filed suit in this Court on February 22, 2021, alleging violations of the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.* ("RA") related to his former employment with the Internal Revenue Service ("IRS").  He alleges the failure to accommodate his disability; unequal terms and conditions of his employment; retaliation; and a June 20, 2020 constructive discharge.  (ECF No. 1, PageID.4-5).

---

[1]Andrew P. Bakul, the former Acting United States Secretary of the Treasury was named as Defendant in the Complaint.  Since that time, Janet L. Yellen became the United States Secretary of the Treasury. She is automatically substituted as Defendant under Fed. R. Civ. P. 25(d).

### A. Factual Background

#### 1. The Complaint's Allegations

Plaintiff makes the following factual allegations. Prior to his June 20, 2020 disability retirement, Plaintiff worked as an agent for the IRS. He alleges that the discrimination against him began in March 2015 for his mental disability "or perceived disability." (*Id*. at PageID.5). He alleges the following discriminatory actions: He was issued "a notice of proposed termination;" he experienced "adverse performance actions"'; he was denied due process in the IRS' grievance proceedings; and he was retaliated against for protesting the untimely processing of his earlier "leave transfer requests." (*Id*. at PageID.6).

Appended to the Complaint are two Department of the Treasury Final Agency Decisions. TD Case No. IRS-20-0497-M contains a review of whether (1) a notice of proposed termination prior to the disability retirement constituted harassment (2) he was subject to adverse performance actions, and (3) Plaintiff was denied due process when filing a grievance. (*Id*. at PageID.10-19). TD Case No. IRS-20-0029-F contains a review of Plaintiff's claim that his supervisors repeatedly failed to timely process leave transfer requests resulting in 144.50 hours of leave without pay. (*Id*. at PageID.23-30). Both reviews resulted in a finding of no discrimination. (*Id*. at PageID.19, 30).

#### 2. Defendant's Exhibits

Defendant's Exhibit A contains Plaintiff's deposition transcript. Plaintiff testified that he began working at the IRS in June 2005 and held a supervisory position from 2011 until September of 2018. (ECF No. 17-2, PageID.150-151). When he was removed from

2

that position in 2018, there was no impact on his salary. (*Id*. at PageID.151).  Although his work station was in Detroit, he had a telework agreement that permitted him to work from his home in Clare, Michigan. (*Id*. at PageID.152). Plaintiff acknowledged that teleworking "is a privilege, not a right," and that to qualify for teleworking, and employee must have "a fully successful performance appraisal." (*Id*. at PageID.153).  During the time he was a supervising agent, Plaintiff was always able to telework, and the IRS never revoked his telework privileges. (*Id*. at PageID.155).

Plaintiff testified that following a less than satisfactory performance review in 2017, his supervisor, Jeffrey Milling, threatened to remove him from teleworking. (*Id*.).  Plaintiff was also placed on a Performance Improvement Plan.  (*Id*. at PageID.160).  On June 27, 2017, Plaintiff filed an accommodation request, seeking the ability to continue teleworking. His request was based on his claim of stress and anxiety due to "situational stressors(s)/traumatic events(s)" since November 2014 "of a personal nature." (Accommodation Request, ECF No. 17-7, PageID.256).  Among these stressors was a criminal case in which his son was charged with counterfeiting.  (ECF No. 17-2, PageID.156, 170).  Plaintiff testified that for at least a year following the November 12, 2014 execution of a search warrant at his house, he was only at around "50 percent" in terms of his "work performance" and "focus." (*Id*. at PageID.169).

Milling then sent Plaintiff an email stating, "You may continue using frequent telework as needed but you will provide me with a schedule for the week ahead." (*Id*. at PageID.163).  Plaintiff responded to Milling, thanking him for his "willingness to accommodate him," and withdrawing his written accommodation request. (*Id*.).

3

On September 30, 2017, Milling relieved Plaintiff of his supervisory duties, but his job title and salary remained the same at that time. (*Id*. at PageID.165). On November 13, 2017, Plaintiff sent Milling an email stating, "I would definitely like to consider and/or be considered for an alternative position to my current group management responsibilities, including a geographic change and/or even one outside of EP yet within the service." (*Id*. at PageID.166). In September of 2018, Plaintiff was formally reclassified as a revenue agent. (*Id*. at PageID.165). He continued to telework at his new position. (*Id*. at PageID.178).

Plaintiff testified that in May 2019 he applied for a disability retirement based on anxiety, depression, and stress. (*Id.* at PageID.193). At the time he applied, no one had threatened to remove his telework agreement. (*Id*. at PageID.192). He stated that Carla Smith, his supervisor at that time, "was wonderful," and he did not claim that she ever discriminated against him. He had a "fully successful" rating at his new job. (*Id*. at PageID.188). His initial application for a disability retirement was denied, but it was granted on appeal. (*Id*. at PageID.193). He retired on June 20, 2020. (*Id*. at PageID.191).

Milling signed Plaintiff's midyear progress review, dated April 24, 2017. The report indicates that Plaintiff was not meeting his goals in several areas. In terms of Leadership and Human Capital Management, Milling wrote:

> [Y]ou were asked to provide a current listing for each agent including on the job visits (OJV), case reviews and work load reviews (WLRs) over the last year. You were to conduct at a minimum one OJV with each employee on a recurring basis. You were asked to provide the Area documentation on these. I followed up on numerous occasions and indicated that it was imperative to provide written WLRs and case reviews for your employees. On February 15, 2017 you indicated no WLRs had been completed. No documentation on

4

case reviews have been provided to the Area office.  You are currently late in performing Mid-Year evaluations for at least three employees from your group. A mid-year for one employee, due on October 31st was not completed until February 13, 2017 after I inquired a minimum of three times.

There have been no written workload or case reviews during 2016 delivered for an employee you identified as having a performance issue. During your operational review you were directed to develop an action plan for this individual. At your request we authorized travel funds for you to travel to Indianapolis and conduct a WLR. No written documentation of a workload review was provided to the area office.

(ECF No. 17-3, PageID.232-233).

Regarding Program Management, the review indicates that Plaintiff is "not meeting [his] managerial duties as they relate to managing group program responsibilities and providing feedback to the area office."  Milling noted cases that were not closed on a timely basis, resulting "in extra work for the closing unit and poor customer service to the taxpayer." (*Id*. at PageID.233).

In Plaintiff's annual rating for the period ending September 30, 2017, he was rated "not met" in the areas of responsibilities and commitments, and received a summary evaluation rating of "not met." (*Id*. at PageID.237).[2]

Plaintiff appealed his review to the Performance Review Board, which affirmed Milling's rating of "not met" on April 10, 2018, indicating that "the deficiencies noted are significant," and that "[t]he summary evaluation rating of 'Not Met' is indicative of your overall performance during the rating period."  (ECF No. 17-11, PageID.265).  On April 27, 2018, Plaintiff's request for reconsideration was denied. (ECF No.17-12, PageID.267).

---

[2] The ratings range from "not met" at the low end, to "minimally satisfactory," "met," "exceeded," and "outstanding." (*Id*.).

5

Plaintiff's Performance Improvement Plan ("PIP"), dated May 5, 2017, is also signed by Milling.  (ECF No. 17-4, PageID.241-247).  It summarizes the performance deficiencies set forth in the mid-year evaluation. (*Id.*).  Milling states, "In order to fully direct you attention to improvement, I plan on removing you from telework and will expect you to report to the office."  (*Id.* at PageID.243).  The PIP also sets forth specific expectations in the areas of leadership and human capital management, customer service, and program management. (*Id.* at PageID.243-247).  Milling states, "Jim, I want to help you improve your performance," and offers additional time, assistance, and other resources, in addition to bi-weekly calls. (*Id.* at PageID.247). The duration of the PIP was 90 days, at the conclusion of which Plaintiff was expected to perform "at least at the minimally successful level" with respect to the "Critical Performance Expectations." (*Id.*).

Defendant has submitted Plaintiff's telework agreement, dated October 1, 2015. (ECF No. 17-5, PageID.250). The agreement states that to be eligible for telework, the employee must have a "fully successful (or equivalent)" performance appraisal, and that "[i]f the employee is on a Performance Improvement Plan (PIP), he or she is not considered to be fully successful and is not eligible for participation in the IRS Telework Program until performance returns to the fully successful level." (*Id.* at PageID.253).

In Plaintiff's Reasonable Accommodation Request, dated June 27, 2017, he requested that he be allowed to continue to telework.  (ECF No. 17-7, PageID.256). Attached to the request is a letter from Plaintiff's treating psychologist. (ECF No. 17-8, PageID.259).

6

A letter to Plaintiff, dated May 3, 2018, from the IRS Director of Employee Plans Examination, states, "It is proposed to remove you from the Internal Revenue Service at any time after thirty (30) calendar days from the date you receive this letter." (ECF No. 17-13, PageID.268).  A subsequent letter from the IRS Acting Director of Employee Plans, dated August 28, 2018, affirms the reasons for the proposal to terminate Plaintiff's employment, but concludes, "Although I have concluded that you are performing in an unacceptable manner in your position, I have decided to effect you demotion rather than a removal." (ECF No. 17-16, PageID.295). Plaintiff was reassigned to the position of Revenue Agent, effective September 17, 2018. (*Id.*).  His salary in that position was set at $114,577.00 annually. (ECF No. 17-17, PageID.298).

### B.   Legal Standard

Defendant moves for summary judgment under Federal Rule of Civil Procedure 56 as to Plaintiff's entire complaint.

When a movant shows that "no genuine dispute as to any material fact" exists, the court will grant his motion for summary judgment. Fed. R. Civ. P. 56(a). In reviewing such a motion, the court must view all facts and inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party bears "the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986)) (internal quotation marks omitted). In making its determination, a court may consider the plausibility of the movant's evidence. *Matsushita*, 475 U.S. at

587-88. Summary judgment is also proper where the moving party shows that the non-moving party cannot meet its burden of proof. *Celotex*, 477 U.S. at 325.

The non-moving party cannot rest merely on the pleadings in response to a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Instead, the non-moving party has an obligation to present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993). "[T]o withstand a properly supported motion for summary judgment, the non-moving party must identify specific facts and affirmative evidence that contradict those offered by the moving party." *Cosmas v. Am. Express Centurion Bank*, 757 F. Supp. 2d 489, 492 (D. N.J. 2010). In doing so, the non-moving party cannot simply assert that the other side's evidence lacks credibility. *Id.* at 493. And while a *pro se* party's arguments are entitled to liberal construction, "this liberal standard does not, however, 'relieve [the party] of his duty to meet the requirements necessary to defeat a motion for summary judgment.'" *Veloz v. New York*, 339 F. Supp. 2d 505, 513 (S.D.N.Y. 2004) (quoting *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003)). "[A] pro se party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D. N.Y. 1995) (quoting *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

When the non-moving party fails to adequately respond to a summary judgment motion, a district court is not required to search the record to determine whether genuine issues of material fact exist. *Street*, 886 F.2d at 1479-80. The court will rely on the "facts presented and designated by the moving party." *Guarino v. Brookfield Twp. Trs.*, 980 F.2d

8

399, 404 (6th Cir. 1992). After examining the evidence designated by the parties, the court then determines "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so onesided that one party must prevail as a matter of law." *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 251-52). Summary judgment will not be granted "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.

"[A] district court cannot grant summary judgment in favor of a movant simply because the adverse party has not responded." *Arrington v. Cenlar Federal Savings Bank*, No. 19-10571, 2020 WL 5258466, at *2 (E.D. Mich. Sept. 2, 2020) (citing *Carver v Bunch*, 946 F.2d 451, 455 (6th Cir. 1991)). "The movant bears the burden of showing the absence of a genuine issue as to a material fact 'regardless if an adverse party fails to respond.'" *Id.* at *2 (citing *Carver*, F.2d at 454-455). Accordingly, "[t]he Court may grant a motion for summary judgment to which the plaintiff failed to respond if it first 'examine[s] the moving party's motion for summary judgment to ensure that it has discharged its initial burden' of demonstrating 'the absence of a disputed question of material fact and a ground that would entitle the moving party to judgment as a matter of law.'" *Simpson v. Metropolitan Life Insurance Corporation*, No. 18-cv-11724, 2019 WL 1354186, at *2 (E.D. Mich. Mar. 26, 2019) (citing *Miller v. Shore Fin. Servs., Inc.*, 141 F. App'x 417, 419 (6th Cir. 2005)).

## C.    ANALYSIS

Plaintiff raises four claims under the Rehabilitation Act: (1) disability discrimination based on his "demotion" to a Revenue Agent; (2) failure to accommodate

9

his disability; (3) hostile work environment and constructive discharge; and (4) retaliation for filing EEO charges. Each will be addressed in turn.

### 1. Disability Discrimination

The Rehabilitation Act, 29 U.S.C.A. § 794(a), provides:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

Plaintiff testified that Jeffrey Milling, his supervisor, never made any direct comments about his disability. (ECF No. 17-2, PageID.153). Therefore, the Court applies the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).  In such a case, first, the plaintiff must make out a *prima facie* case of discrimination. "Once the *prima facie* case is made, a defendant may offer any legitimate, non-discriminatory reason for the employment action, which the plaintiff may rebut by evidence of pretext; however, the burden of proof always remains with the plaintiff." *Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996).

To establish a prima facie case of disability discrimination under the Rehabilitation Act, "a plaintiff must show that 1) he or she is disabled; 2) is otherwise qualified for the position, with or without reasonable accommodation; 3) suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the disabled individual was replaced." *Whitfield v. Tennessee*, 639 F.3d 253, 258–59 (6th Cir. 2011)

(internal quotation marks omitted). "Furthermore, the disability must be a 'but for' cause of the adverse employment action." *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 306 (6th Cir. 2016) (citing *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 318 (6th Cir. 2012) (en banc)).[3] And under § 794(a), the disability must be the *sole* reason for the adverse employment action.

In the present case, it may be assumed that Plaintiff has met the first two elements of a *prima facie* case: he suffered from a disability and he was otherwise qualified for the position he had held since 2011. However, his removal from the supervisory position and reclassification as a revenue agent did not constitute an adverse employment action.

In *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876 (6th Cir. 1996), the plaintiff, a nursing supervisor, was reassigned as a Unit Nurse, presumably a subordinate position. However, her pay initially remained the same and was eventually increased. The Court held that in an ADA case the plaintiff "must show that her reassignment to unit RN was a materially adverse change in the terms of her employment." *Id*. at 885. Finding that this reassignment did not constitute a "materially adverse" action, the Sixth Circuit stated, "This court has held that reassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims." *Id*. at 885 (citing *Yates v. Avco Corp.*, 819 F.2d 630, 638 (6th Cir. 1987)). The Court also

---

[3] While *Tennial* was a case brought under the Americans with Disabilities Act, "the standards under both of the acts are largely the same, cases construing one statute are instructive in construing the other." *Andrews v. State of Ohio*, 104 F.3d 803, 807 (6th Cir. 1997) (citing *Wooten v. Farmland Foods,* 58 F.3d 382, 385 n.2 (8th Cir. 1995).

stated that a "mere inconvenience or an alteration of job responsibilities is not enough to constitute an adverse employment action."

Likewise, Plaintiff's reassignment did not materially alter his salary or his hours (including his ability to telework), and in fact he received a higher salary in his new position. And to the extent that he argues his "demotion" to an agent's position impacted the perceived status or respect that came with his former supervisory position, that would not constitute a "materially adverse" action that would support a *prima facie* case of discrimination. An "employee's subjective impressions as to the desirability of one position over another are not relevant." *Policastro v. Northwest Airlines, Inc.*, 297 F.3d 535, 539 (6th Cir. 2002);*see also Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 182 (6th Cir. 2004) (revocation of plaintiff's mentor status in an M.D./Ph.D graduate program and removal from his position of Medical Director of Pathology Laboratory Services "simply do not amount to adverse employment actions."). Moreover, "a 'bruised ego' is simply not enough to constitute an adverse employment action." *Id.*

Finally, while it is true that after Plaintiff was placed on the PIP Milling initially told him that he would not be permitted to telework. However, after he filed his accommodation request his telework agreement remained in force. Because Plaintiff's telework privileges were never actually suspended, Milling's statement that he intended to suspend them does not represent an adverse employment action. In *Mitchell*, 389 F.3d at 182, the Sixth Circuit held: "Mere threats of alleged adverse employment action are generally not sufficient to satisfy the adverse action requirement…. [Plaintiff] never suffered an adverse employment action because the proposed actions challenged here were

12

never implemented. Therefore, those actions do not constitute adverse employment actions."

Because Plaintiff cannot show an adverse action, he has not sustained his burden of showing a *prima facie* case of disability discrimination.[4]  But even assuming for the sake of argument that he had, his claim would fail on the second and third prongs of *McDonnell Douglas*.  As to the second prong, the IRS has met its burden of showing a non-discriminatory reason for reassigning Plaintiff to the Revenue Agent position.  Plaintiff received a poor mid-year evaluation in 2017 based on serious and documented deficiencies in the performance of his duties as a supervising agent. He failed to correct these deficiencies under the terms of his PIP.  His poor work performance negatively affected the efficient functioning of his department and customer service. The IRS has shown that reassigning him was based on the non-discriminatory reason of job performance.

Under the third prong of *McDonnell Douglas,* the burden shifts back to the Plaintiff to show that the IRS's stated reasons are pretextual. He may meet that burden by showing (1) that the proffered reason had no basis in fact, (2) that the proffered reason did not actually motivate the reassignment, or (3) that the proffered reason was not sufficient to

---

[4] In his response, Plaintiff asks that the Court "permit his providing proof" of Defendant's allegations "as this case proceeds to trial." (ECF No. 19, PageID.340). He is in effect asking the Court to reopen discovery. However, as Defendant points out in the reply brief, Plaintiff "did not serve a single interrogatory, request for production of documents, or request to admit during the discovery period," nor did he seek to depose any witnesses. (ECF No. 20, PageID.346).  Nevertheless, as part of its initial disclosures, Defendant provided him "with 2,370 pages of IRS documents relating to Plaintiff's employment at the agency." (*Id.*). Plaintiff had the opportunity to obtain additional "proof" during the six-month discovery period. He did not do so, and he has now failed to meet his burden of identifying "specific facts and affirmative evidence that contradict those offered by the moving party." *Cosmas*, 757 F. Supp. 2d at 492. At this late date, Plaintiff does not get a second chance to conduct discovery.

motivate the reassignment. *Clark v. Walgreen Co.,* 424 Fed.Appx. 467, 473–474 (6th Cir. 1994) (citing *Manzer v. Diamond Shamrock Chem. Co.,* 29 F.3d 1078, 1084 (6th Cir.1994) (overruled on other grounds, *Geiger v. Tower Automotive*, 579 F.3d 614 (6th Cir. 2009)).

Plaintiff's reassignment to the Revenue Agent position, as documented by Defendant, was clearly based on the fact of his poor performance, and he has not shown otherwise.    In addition, Plaintiff has not shown that his disability was the sole, or even the "but for," cause of his reassignment.  He received a sub-par employment evaluation that documented numerous deficiencies in his job performance, including basic managerial responsibilities.  As a result, he was placed on a 90-day PIP, yet his poor performance continued.  On appeal of his poor rating for the period ending September 30, 2017, the Performance Review Board found that "[t]he summary evaluation rating of 'Not Met' is indicative of your overall performance during the rating period."  (ECF No. 17-11, PageID.265).  In the end, he faced termination, but was reassigned to the Revenue Agent position (again, at a higher salary) rather than being fired.  This reassignment was based on his performance, not disability.

Further, Plaintiff acknowledged that on November 13, 2017, he sent Milling an email stating that he "would definitely like to consider and/or be considered for an alternative position to my current group management responsibilities…." (ECF No. 17-2, PageID.166).  Far from suffering disability discrimination, he got what he asked for.  Nor has he shown that the proffered reason did not actually motivate his reassignment.  Again, he received the negative evaluation and was placed on a PIP before he requested the accommodation, which was granted. Finally, the proffered reason was sufficient not only

14

to motivate the Plaintiff's reassignment, but to result in his termination. Ultimately the IRS opted to not terminate him, but rather to retain him as an employee and reassign him to a position where he would not have the administrative responsibilities he had been performing poorly.

Defendant is entitled to summary judgment on Plaintiff's disability discrimination claim.

### 2.    Failure to Accommodate

To establish a prima facie claim of failure to accommodate claim, Plaintiff must show "that (1) [he] was disabled within the meaning of the ADA; (2) [he] was otherwise qualified for [his] position, with or without reasonable accommodation; (3) [his employer] knew or had reason to know about [his] disability; (4) [he] requested an accommodation; and (5) [his employer] failed to provide the necessary accommodation." *Brumley v. United Parcel Serv., Inc.*, 909 F.3d 834, 839 (6th Cir. 2018).  Plaintiff's claim falters on the fifth prong, because the IRS provided his requested accommodation.

Plaintiff, who lived in Clare, Michigan, had a telework agreement since October 1, 2015. (ECF No. 17-5, PageID.250-251).  It was only on June 27, 2017, after his poor mid-year review and his being placed on a PIP, that he filed a Reasonable Accommodation Request seeking the continued ability to telework. (ECF No. 17-7, PageID.256).  And even though his current agreement precluded teleworking while on a PIP, he was permitted to continue teleworking, and was never denied the ability to telework at any time his employment.  Indeed, when Milling informed him that he could continue teleworking, Plaintiff responded with a email

thanking him for his "willingness to accommodate him," and withdrawing his written accommodation request. (ECF No. 17-2, PageID.163).

Plaintiff also appears to argue that he suffered a Rehabilitation Act violation when the Defendant delayed or denied his application for the Leave Transfer Program and declined to disseminate his request for leave donations beyond his permanent working group. As a result, he claims, he was forced to take unpaid leave time ("LWOP"). However, the record shows that Plaintiff's leave transfer request was granted and processed pursuant to policy, and that he had to take LWOP because he did not receive enough donated leave to cover his entire absence. The final Agency Decision in his administrative complaint explains as follows:

> The members of management who testified in this case all assert that the processing of Complainant's Leave Transfer Program application and the dissemination of the solicitation emails were handled properly and according to policy. *The record shows that Complainant's application for the Leave Transfer Program was approved and soon thereafter, solicitation emails were sent to his POD and working group per Leave Transfer Program policy requirements*.
>
> Complainant asserts that S1 was also required to disseminate the solicitation request simultaneously to his permanent working group, EP. However, there was no such requirement as Complainant was on a three (3) year detail with the Compliance Planning & Classification section (CP&C), and M1 was his supervisor of record. *In addition, the record shows that although delayed, management affirmatively responded to Complainant's request by sending the solicitation request to EP employees in November 2019.* According to the record, an expansion beyond the recipient's POD and working group is not required for the initial solicitation of leave but can be considered if the recipient is unable to receive the amount of leave donations needed.
>
> *The record shows that following management's solicitation to CP&C and EP in accordance with Complainant's request, he never received enough hours of donated leave to cover the entire time of his absence, which resulted*

*in his taking LWOP. The record does not show any deviation of normal policy by the members of management involved.*

(ECF No. 17-19, PageID.312) (emphasis added).

Because Plaintiff cannot show any deviation of normal IRS policy in processing his leave transfer request, Defendant is entitled to summary judgment on the failure to accommodate claim.

### 3.   Hostile Work Environment and Constructive Discharge

To support a hostile work environment claim in a disability discrimination case, a plaintiff must show "(1) she was disabled; (2) she was subject to unwelcome harassment; (3) the harassment was based on her disability; (4) the harassment unreasonably interfered with her work performance; and (5) the defendant either knew or should have known about the harassment and failed to take corrective measures." *Trepka v. Bd. of Educ.*, 28 F. App'x 455, 460-61 (6th Cir. 2002).  The level of harassment must be such that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, [and] that [it] is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotations and citations omitted).

In *Laster v. City of Kalamazoo*, 746 F.2d 714 (6th Cir. 2014), the Court set forth the elements of a constructive discharge claim as follows:

A constructive discharge occurs when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation. To demonstrate a constructive discharge, Plaintiff must adduce evidence to show that 1) the employer deliberately created intolerable working conditions, as perceived

by a reasonable person, and 2) the employer did so with the intention of forcing the employee to quit.

*Id.*, at 727-28.  The bar is high for establishing a constructive discharge claim.  "'A plaintiff who advances such a ... claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign.'" *Johnson v. Aston Carter, Inc.*, No. 22-CV-10025, 2022 WL 1695768, at *5-6 (E.D. Mich. May 26, 2022) (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 147-48 (2004)).  Moreover, "the fact that plaintiff may have proven a hostile work environment is not enough by itself to prove constructive discharge also."  *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999).

In the present case, there is insufficient evidence to support either a hostile work environment claim or a constructive discharge claim.  As discussed above, Plaintiff received a poor job evaluation and was placed on a PIP based on his job performance, not disability.  The negative evaluation occurred before he raised his claim of disability. *See Wharton v. Gorman-Rupp Co.*, 309 F. App'x 990, 998 (6th Cir. 2009) ("Employers are, of course, permitted to supervise and negatively evaluate their employees. This is particularly true when the employer's concerns about the employee's performance predated her complaints about discrimination.").  And far from creating a work environment "permeated with discriminatory intimidation, ridicule, and insult," or imposing "working conditions so intolerable that a reasonable person would have felt compelled to resign," the IRS went out of its way to work with and accommodate Plaintiff.  He was given the opportunity to improve, with the offer of any assistance he needed, and when he still fell short of the

required level of performance, he was not fired, but instead transferred to a position where he received a higher salary. He was permitted to telework even when he was on a PIP, contrary to the terms of the teleworking agreement. He testified that he got along well with his new supervisor, and his performance evaluation in the new job was good.  Under these facts, no reasonable jury could find either a hostile work environment or a constructive discharge

### 4.   Retaliation

Where, as here, there is no direct evidence of retaliation in an ADA or RA case, such claims are analyzed under the *McDonnell Douglas* framework. *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014). "To make out a prima facie case of retaliation, a plaintiff must demonstrate that (1) she engaged in protected activity under the ADA, (2) her employer was aware of that activity, (3) she suffered an adverse employment action, and (4) a 'causal connection' existed between the protected activity and the adverse action." *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 396 (6th Cir. 2017).

Plaintiff engaged in protected activity by filing EEO complaints in May 2018 (ECF No. 17-14, PageID.277), November 2019 (ECF No. 17-18, PageID.300), and August 2020 (ECF No. 17-20, PageID.320). However, he fails the third prong of a *prima facie* case because he did not suffer an adverse employment action.  For the reasons discussed in § (C)(1) above, being reassigned to another position with greater pay and retaining the ability to telework cannot be considered a materially adverse action.  *Kocsis*, 97 F.3d at 885.  And even if the reassignment constituted an adverse action, Plaintiff fails the fourth prong because there is no causal connection between his poor performance review or his

reassignment.  Both the negative mid-year review in April 2017 and the reassignment in September 2017 occurred *before* he filed his first EEO complaint in May 2018.

And further, for the reasons discussed in § (C)(1) above, even if we assume that Plaintiff established a *prima facie* case, he fails the second and third prongs of *McDonnell Douglas*.  As to the second prong, Defendant has carried the burden of showing a non-retaliatory reason for reassigning Plaintiff - his poor job performance and his failure to show improvement during the 90-day PIP, even though he was granted the accommodation of continuing his telework arrangement.  As to the third prong, Plaintiff has not carried his burden of showing that the proffered reason for the reassignment was a pretext for retaliation.

The alleged retaliation must be a 'but for' cause of the adverse employment action. In other words, a plaintiff must provide "proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas S.W. Med. Ctr. V. Nassar*, 570 U.S. 338, 360 (2013).  Given the evidence of Plaintiff's deficient job performance as a supervising agent, no "reasonable juror could conclude that the [PIP or reassignment] would not have occurred but for his engagement in protected activity." *Eckerman v. Tenn. Dep't of Safety*, 636 F.3d 202, 209 (6th Cir. 2010).

In summary, Plaintiff, who had a number of stressors in his life, began to default on many of his responsibilities as a supervisor.  As a result, he was given the opportunity to improve his performance through a PIP that included support or assistance needed. Although at that point he was disqualified from teleworking under his agreement, he was

nevertheless granted his accommodation request to continue doing so. He himself asked about transferring to a position where he did not have the supervisory responsibilities (ECF No. 17-2, PageID.166), and although he faced termination as the result of his failure to improve, he was in fact transferred to such a position, with an increase in pay. He had a good relationship with his new supervisor, and he received a good evaluation in his new position. Under these facts, he has not demonstrated that any rational trier of fact would find in his favor on any of his claims.

## III.   CONCLUSION

For these reasons, I **RECOMMEND** that the Court **GRANT** Defendant Janet L. Yellen's motion for summary judgment. (ECF No. 17).

## IV.   REVIEW

Rule 72(b)(2) of the Federal Rules of Civil Procedure states that "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 155; *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d

1370, 1373 (6th Cir. 1987).  According to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: August 29, 2022                                    S/ PATRICIA T. MORRIS
                                                         Patricia T. Morris
                                                         United States Magistrate Judge